FILED
02 OCT 31 AM 9:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| **VICTOR C. HARPER,** | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-01-N-2698-W |
| | ] | |
| **DELPHI AUTOMOTIVE SYSTEMS,** | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED
OCT 31 2002

**Memorandum of Opinion**

**I.   Introduction.**

This case involves claims brought under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"). The court has for consideration defendant's motion for summary judgment, filed September 3, 2002. [Doc. # 52.] The issues have been briefed by both parties and are now ripe for decision. Upon due consideration, the court finds that the motion is due to be granted in all respects.

**II.   Facts.**[1]

The plaintiff, Victor C. Harper ("Mr. Harper"), is a Vietnam Veteran who suffers from Post Traumatic Stress Disorder ("PTSD"), an impairment with which he was diagnosed in 1998. This disorder manifests itself in the form of sleep problems, mood swings, panic attacks, flashbacks, and blackouts. Specifically, PTSD causes Mr. Harper to have night

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



sweats and bad dreams; however, the medication he currently takes mitigates his sleep problems and he now "[w]ake[s] up less and sleep[s] more hours" than before he began taking medication. (Harper Dep. at 68.) Mr. Harper experiences mood swings in that "if somebody gets violent with [him], it affects [him and he] get[s] kind of outraged." (*Id.* at 64.) He also generally has difficulty dealing with stressful situations, but he does not experience panic attacks more than once a year. As to flashbacks and blackouts, although he frequently has minor flashbacks, the last major flashback or blackout Mr. Harper experienced occurred in 1998, prior to his PTSD diagnosis.[2]

In August 2000, Mr. Harper transferred from his job at the General Motors facility in Monroe, Louisiana, to a facility run by the defendant, Delphi Automotive Systems ("Delphi"), in Tuscaloosa, Alabama. At all times relevant to this litigation, all hourly employees of Delphi, including Mr. Harper, were members of the United Auto Workers Union ("UAW"). Upon commencing his employment at Delphi, Mr. Harper underwent a physical examination with the plant physician, Dr. Wheat. At that time, Mr. Harper disclosed his PTSD to Dr. Wheat, although there is no evidence that Dr. Wheat shared this information with anyone else at Delphi at that time. Mr. Harper was employed as an assembly line operator and a welder, and his last supervisor was Betty Hurt ("Ms. Hurt"), a black female who served as Mr. Harper's supervisor for approximately six months. Mr. Harper testified

---

[2] At several points in his deposition, Mr. Harper or his attorney claimed that he was experiencing PTSD "episodes." Counsel for the defendant noted for the record that he saw "no difference in behavior that would indicate that the deponent [was] undergoing an episode of any kind whatsoever." (Harper Dep. at 137.) Interestingly, the PTSD "episodes" during the deposition typically followed particularly difficult lines of questioning by counsel for the defendant.

that "[o]ther employees had problems with Ms. [Hurt]." (Harper Dep. at 134.) Mr. Harper also testified that he "got along okay" with Ms. Hurt "for the most part." (*Id.* at 158.)

Sometime prior to February 14, 2001, the first incident of alleged harassment by Ms. Hurt occurred. Mr. Harper testified that his machine was not working properly, so he turned in a maintenance card. When maintenance did not respond, he went to Ms. Hurt's office to notify her of the problem. Ms. Hurt responded by becoming "loud on [Mr. Harper] and . . . kind of embarrass[ing him] in the office," and telling him that he "didn't know what [he] was talking about in reference to the machine, where [is he] supposed to be, [he] need[s] to get out there." (Harper Dep. at 104-05.) At that point, Mr. Harper walked out of Ms. Hurt's office.

On February 14, 2001, Mr. Harper was scheduled to work on Team A in Department 255; however, when he arrived at work, team leader Bob Crane told him that he was being "loaned out" to Team B. When Ms. Hurt discovered that Mr. Harper was not working on Team A as scheduled, she "scream[ed], cuss[ed] and holler[ed] at [him]" and told him to return to his assigned work station. (Harper Dep. at 108.) When Mr. Harper walked toward the work station to which he was assigned, Ms. Hurt followed him and continued to yell at him. Mr. Harper subsequently contacted his union committeeman, Steve Miller ("Mr. Miller"), and asked Mr. Miller to file a grievance on his behalf. Mr. Harper testified that this incident was the worst thing that happened to him at Delphi. At some point after this incident, Mr. Harper informed Mr. Miller about his PTSD; Mr. Miller, in turn, informed labor relations director Garry Gilliam, who showed Ms. Hurt a copy of a letter from a physician describing Mr. Harper's condition.

Approximately one week after the February 14, 2001, incident, Mr. Harper submitted a suggestion to Delphi concerning a procedure on a work station.[3] Ms. Hurt called him into her office a few days later and told him that Delphi could not pay him for the suggestion because at the time Mr. Harper made the suggestion, Delphi "already had it in the making." (Harper Dep. at 118.) Ms. Hurt raised her voice and cursed at Mr. Harper during this meeting. The next day, after a safety meeting, Ms. Hurt told Mr. Harper that she wanted to meet with him in her office, but he did not go to her office that day. The following day, he went to Ms. Hurt's office at her request. Also present at this meeting was a Delphi employee named Phil. Ms. Hurt told Mr. Harper again that he would not be paid for the suggestion, whereupon a heated argument ensued. When Mr. Harper was leaving Ms. Hurt's office, she told him "you will be back in here sometime today." (Harper Dep. at 129.) Mr. Harper did not return to Ms. Hurt's office that day, and he experienced no further problems with Ms. Hurt. Mr. Harper testified that he did not know why Ms. Hurt treated him the way she did, and that he "couldn't say" that Ms. Hurt's actions were undertaken because he had PTSD. (Harper Dep. at 135.)

On his last day of work, April 4, 2001, Mr. Harper had a vision of choking Ms. Hurt as he passed her in the plant. Mr. Harper notified Mr. Miller of the vision, and Mr. Miller took Mr. Harper to the plant nurse, who allowed him to go home until he could see a physician. On April 12, 2001, Mr. Harper filled out an application for Delphi sickness and accident benefits, on which he indicated that the date upon which he would be able to

---

[3] Delphi has a system whereby employees who make suggestions that are later implemented by the company are paid for their suggestions. (Harper Dep. at 120.)

return to work was "unknown." (Harper Dep., Ex. 3, ¶ 7.) On May 7, 2001, Mr. Harper told his treating physician, Dr. Champena, that he had decided to accept a medical retirement from Delphi. Ms. Hurt accepted a career transition program separation from Delphi that became effective on June 1, 2001; thus, she is no longer employed by Delphi. On July 18, 2001, Dr. Champena indicated that Mr. Harper must stay off work indefinitely and that he was permanently disabled. On April 2, 2002, Mr. Harper accepted a voluntary medical retirement from Delphi.

Mr. Harper testified that he never asked for a transfer to a different shift or for a different supervisor, nor did he bid for any positions in 2001 because he did not know of any vacancies. Mr. Harper did not suggest or ask for any accommodations related to his PTSD.[4]

## III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no

---

[4] The plaintiff claims that filing the grievance on February 14, 2001, which "basically . . . was asking that [Ms. Hurt] stop the yelling and screaming," (Gilliam Dep. at 50), and telling Ms. Hurt "you've said enough," (Harper Dep. at 110), amount to requests for accommodations. Although no magic words are needed to request an accommodation, the court is of the opinion that such generalized requests, with no reference to Mr. Harper's impairment, cannot satisfy the plaintiff's burden to request a reasonable accommodation.

5

genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.   Discussion.

The plaintiff has raised the following claims under the ADA: failure to accommodate, failure to engage in the interactive process, disability harassment, and constructive discharge. He has also raised a state law claim for negligent training or supervision of Ms. Hurt. The court will address each of the plaintiff's claims in turn.

### A.   The ADA claims.

#### 1.   Qualified individual with a disability.

To be entitled to the protection of the ADA, a plaintiff must show that he is a qualified individual with a disability within the meaning of the Act. The ADA defines a qualified

individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability, for purposes of the ADA, is, *inter alia*, "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." *Id.* § 12102(2)(A). The court assumes PTSD would be classified as a mental impairment; thus, to succeed on any of his ADA claims, Mr. Harper must show that he is substantially limited in one or more major life activities.

Mr. Harper alleges that he is substantially limited in the following major life activities: working, sleeping, interacting with others, and thinking.[5] To establish that PTSD substantially limits Mr. Harper's ability to engage in these activities, he must show that he is "prevent[ed] or severely restrict[ed]" from performing the activities. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 122 S. Ct. 681, 691 (2002). Furthermore, the impairment's impact must be permanent or long term. *Id.* In determining whether an impairment substantially limits the plaintiff, the court must consider any mitigating measures that correct or lessen the effects of the impairment. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83 (1999).

To demonstrate that he is substantially limited in the major life activity of working, the plaintiff must show "significant[ ] restrict[ions] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 912 (11th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Mr. Harper seems to allege that

---

[5] For purposes of this motion, the court assumes, without so holding, that sleeping, interacting with others, and thinking are major life activities. Because the court finds Mr. Harper is not substantially limited in his ability to perform any of these activities, the court need not determine whether they are, in fact, major life activities.

he is precluded from engaging in any type of employment and is therefore substantially limited in the major life activity of working. (Doc. # 62, Ex. CC, at 6 ("Mr. Harper applied and was approved for SSDI benefits. Obviously the Social Security Administration agrees that Mr. Harper is unable to find alternative employment since retiring." (citations to the record omitted)).) A conclusory allegation that Mr. Harper is unable to work, without a delineation of a "broad range of jobs" that he is incapable of performing, does not demonstrate to the court's satisfaction that he is substantially limited in the major life activity of working.

Furthermore, despite his claim that he is completely unable to work, Mr. Harper testified that it is possible that there is some "low-stress light-duty" work he could perform. (Harper Dep. at 169.) Indeed, Mr. Harper's failure to accommodate claim is premised on the allegation that he could have performed his job if Delphi allowed him to work under a different supervisor. In the absence of a better explanation of how Mr. Harper can contend that he is completely unable to work such that he is substantially limited in the major life activity of working *and* that he would be capable of performing the essential duties of his job at Delphi under a different supervisor, the court is of the opinion that Mr. Harper has not shown he is substantially limited in the major life activity of working. *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example 'unable to work' will appear to negate an essential element of her ADA case – at least if she does not offer a sufficient explanation.").

Nor is Mr. Harper substantially limited in his ability to sleep. Although he testified that prior to taking medication for his PTSD, Mr. Harper experienced frequent night sweats

8

and bad dreams (Harper Dep. at 63), now that he takes medication, he has only occasional night sweats (*Id.* at 66), and he "[w]ake[s] up less and sleep[s] more hours" – approximately seven hours a night (*Id.* at 67-68). Because mitigating measures have essentially corrected any sleep problems PTSD caused Mr. Harper, he is not substantially limited in the activity of sleeping.

Mr. Harper contends that he is substantially limited in his ability to interact with others. In support of this contention, Mr. Harper lists his difficulties in dealing with Ms. Hurt and problems with his wife. However, Mr. Harper has some ability to interact with others; he testified that he "sit[s] around and talk[s]" on weekends with a friend. (Harper Dep. at 17.) As to his difficulties in dealing with Ms. Hurt, Mr. Harper's testimony that "[o]ther employees had problems with Ms. [Hurt]," (Harper Dep. at 134), militates against a finding that Mr. Harper's difficulties in dealing with her were caused by his PTSD. (*See also* Gilliam Dep. at 50 ("[I]t was not uncommon for employees to complain that [Ms. Hurt] was brash.").) Furthermore, Mr. Harper does not link the problems with his wife to PTSD. Indeed, he indicated in his deposition that he and his wife "couldn't get along" after he left his employment at Delphi because he was "around the house all the time." (*Id.* at 22.) The plaintiff has not demonstrated that PTSD prevented or severely restricted him from interacting with others.

Finally, Mr. Harper asserts that he is substantially limited in the activity of thinking because he experiences flashbacks and blackouts due to his PTSD. Mr. Harper testified that his last major flashback or blackout occurred in 1998, (Harper Dep. at 60), although he claims to have had "a lot of" smaller flashbacks since that time (*Id.* at 176). Although he

9

claims to have experienced several PTSD "episodes" during his deposition, upon review of the transcript of the deposition, the court is of the opinion that Mr. Harper's ability to think was unhampered by any PTSD "episodes." The court therefore finds that Mr. Harper is not prevented or severely restricted from thinking.

Because he has not shown that he is substantially limited in any major life activities, Mr. Harper has not established that he is disabled within the meaning of the ADA and therefore entitled to the protections of the Act. Furthermore, because Mr. Harper claims that he is currently unable to work at all, the court is of the opinion that Mr. Harper is not a qualified individual under the Act. *See* 42 U.S.C. § 12111(8) (defining qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). However, because it finds that Mr. Harper's specific claims under the ADA must fail for additional reasons, the court will briefly discuss each claim in turn.

### 2.   Failure to accommodate.

To succeed on a claim for failure to accommodate, the plaintiff must show that he requested a reasonable accommodation. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). In this case, Mr. Harper never requested an accommodation. *See supra* at 5, n.4. Because "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made," *Gaston*, 167 F.3d at 1363, and because Mr. Harper did not ask for an accommodation, Delphi can have no liability for failing to provide a reasonable accommodation in this case.

Furthermore, even if Mr. Harper had asked for an accommodation, he has not met his burden of identifying a reasonable accommodation that would allow him to perform his job. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). Mr. Harper contends that allowing him to transfer to another job or another shift or "adjusting Ms. Hurt's supervisory methods" are reasonable accommodations that would allow him to perform his job at Delphi. However, reassignment is a reasonable accommodation only if there is a vacant position. *See Terrell*, 132 F.3d at 626; *see also Lucas v. Grainger*, 257 F.3d 1249, 1257 (11th Cir. 2001); *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224 (11th Cir. 1997). Mr. Harper has offered no proof that there was a vacant position to which he could have been transferred or a vacancy on another shift. Indeed, Mr. Harper testified that he was not aware of any vacancies. (Harper Dep. at 196.) Therefore, a transfer is not a reasonable accommodation in this case.

Nor does the court believe that a change in Ms. Hurt's supervisory methods would have been an effective reasonable accommodation of Mr. Harper's disability. Mr. Harper testified that even after Ms. Hurt's employment at Delphi ended, he could not return to work "[b]ecause there was too much damage done." (Harper Dep. at 202.) Thus, assuming, but not so holding, that a change in Ms. Hurt's supervisory methods is a reasonable accommodation, the evidence suggests that such an accommodation would *not* have enabled Mr. Harper to perform the essential functions of his job. Because Mr. Harper has not adduced substantial evidence on several essential elements of his failure to accommodate claim, summary judgment is due to be granted as to this claim.

11

### 3. Failure to engage in the interactive process.

The Eleventh Circuit has held that "the ADA provides no cause of action for 'failure to investigate' possible accommodations." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997). An employer cannot be held liable for failing to engage in the interactive process unless a reasonable accommodation could have been made for the employee. *Willis*, 108 F.3d at 285. Because, as demonstrated above, Mr. Harper has not established the existence of a reasonable accommodation that would have allowed him to perform his job, he cannot succeed on a claim for failure to engage in the interactive process, and summary judgment is due to be granted on this claim.

### 4. Disability harassment.

To succeed on a claim for disability harassment, the plaintiff must show: (1) he is a qualified individual with a disability, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his disability, (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create an abusive working environment, and (5) a basis for holding the employer liable. *Stedman v. Bizmart*, No. CV-01-H-1675-S, 2002 WL 31012958, at *6 (N.D. Ala. Sept. 3, 2002). As demonstrated above, Mr. Harper cannot prove the first element of his harassment claim: that he is a qualified individual with a disability. Moreover, Mr. Harper has failed to raise any evidence that the alleged harassment perpetrated by Ms. Hurt was based on his disability. Mr. Harper testified that he "really [did not] know" why Ms. Hurt treated him the way she did (Harper Dep. at 139-40); furthermore, he testified that he "couldn't say" that her treatment of him was because he had PTSD (*Id.* at 135). Indeed, the evidence suggests that Ms. Hurt treated all

employees harshly: she "was an aggressive manager" and many employees "complain[ed] that she was brash." (Gilliam Dep. at 50.)

Additionally, the court is of the opinion that three isolated incidents of alleged harassment are not sufficiently severe and pervasive to have altered the terms and conditions of Mr. Harper's employment. To establish severe and pervasive harassment, a plaintiff must prove that he subjectively perceived the harassment as severe and pervasive, and this subjective perception was objectively reasonable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). Mr. Harper has failed to establish the subjective component of this test. He testified in his deposition that the situation with Ms. Hurt did not affect his work performance. (Harper Dep. at 194-95.) Furthermore, even if he did subjectively perceive the harassment as severe and pervasive, such a belief was not objectively reasonable. Three isolated incidents, none of which involved comments or conduct related to Mr. Harper's PTSD, cannot objectively be said to create an environment so pervaded with harassment as to alter the terms and conditions of employment. *Cf. Mendoza*, 195 F.3d at 1247 ("[W]hether [the defendant's] conduct . . . includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable."). Because there is no evidence from which a reasonable jury could conclude that Ms. Hurt's alleged harassment of Mr. Harper was related to his PTSD or that Ms. Hurt's conduct was sufficiently severe and pervasive to alter the terms and conditions of Mr. Harper's employment, summary judgment is proper as to his disability harassment claim.

### 5. Constructive discharge.

Mr. Harper has asserted a claim that he was constructively discharged because of his disability. To show constructive discharge, he "must prove that his working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991); *see also Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999). The court is of the opinion that conduct not severe and pervasive enough to form the basis of a harassment claim cannot rise to the level needed to prove a constructive discharge. *See Landgraf v. U.S.I. Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."). Mr. Harper has not presented evidence from which a reasonable jury could find he was constructively discharged because of his PTSD; therefore, summary judgment will be granted as to this claim.

### B. Negligent training or supervision.

The plaintiff alleges that under Alabama law, he may maintain a negligent training or supervision claim against Delphi. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 2000). However, an employer's liability for negligent training or supervision must be "predicated on the underlying tortious conduct of an employee." *Stevenson*, 762 So. 2d at 824. The Alabama Supreme Court has never recognized a negligent supervision claim premised upon only a federal statutory cause of action. *See Hathorn v. Boise Cascade Corp.*, No. 97-0521-BH-M, 1998 U.S. Dist. Lexis 18113, at *24-*25 ("[I]t is unlikely

the Alabama Court would extend the negligent [training] or supervision tort to include employment discrimination claims since the extension would transform routine employment discrimination cases into state law torts and would undermine Alabama's employment-at-will doctrine."). Even if an underlying ADA claim could form the basis for a negligent training or supervision claim, Mr. Harper's claims under the ADA have not survived the defendant's motion for summary judgment. Because Mr. Harper has alleged no underlying actionable tortious conduct, summary judgment is due to be granted as to the negligent training or supervision claim.

**V.     Conclusion.**

In sum, Mr. Harper has failed to raise a genuine, triable issue of fact as to any of his claims. Delphi's motion for summary judgment will be granted in all respects, and all claims will be dismissed with prejudice. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 30th of October, 2002.

                                                                EDWIN L. NELSON
                                                                UNITED STATES DISTRICT JUDGE